## SEMIDEY ET AL., Complainants,

*v.*

## CENTRAL AGUIRRE ET AL., Dfts.

---

San Juan, Equity, No. 874.

ON INJUNCTION OF EXTENSION OF LEASE, ETC.

Previous Ruling—Law of the Case.

1. Where a case in Porto Rico presents both legal and equitable features, and the court decided it should proceed by a bill in equity, this ruling will not be questioned by a subsequent judge, and becomes the law of the case.

Law Questions—Change of Judge.

2. Law questions may, upon the merits of the case, be decided differently from the way they were decided originally upon demurrer, whether or not the same judge presides. Parties have no vested right in the court's mistakes.

Tender—Offer of Compromise.

3. A tender is not revocable. In many cases the property tendered ceases to be under the control of the defendant, and in some cases becomes the property of the plaintiff. But an offer of compromise may be withdrawn before acceptance.

Semidey v. Central Aguirre.

Landlord and Tenant—Duties.

4. Under the Porto Rican Civil Code, if the lessor or lessee does not comply with the provisions of the lease as to payment and use agreed or customary, or payment of expenses agreed on, the injured party may have rescission or damages. The lessor may dispossess the lessee upon expiration of the term, default in payment, infraction of conditions, or improper use of premises.

Rescission—Substantial Breach.

5. If a contract is substantially carried out there can be no rescission or forfeiture, and injury not going to the essence of the contract will in equity be ground for damages only.

Repairs—Waste.

6. At civil law the landlord is bound to make repairs, but if by contract this is assumed by the tenant, he may change fences, ditches, and the like, provided he does not change the substantial form of the thing leased.

Lessee—Encroachments of Third Parties.

7. While the tenant is responsible for allowing encroachments upon the premises adversely to the title, permitting the building of temporary tenants' houses is not of this character.

Repair—Waste.

8. The Civil Code of Porto Rico makes a distinction between repair and waste. A tenant committing waste may be liable for treble damages.

Damages—Forcible Entry.

9. In unlawful detainer judgment may be entered for three times the actual damages, but it is doubted whether this can be enforced in equity.

Assignment of Lease—Sublease.

10. Under the Porto Rican Code, as at common law, a lease cannot be assigned to a third party. Semble that the organic act abolishes Spanish laws not in force in 1900.

Cession—Appointment of Agent.

11. Where a tenant appoints an agent to act for him as to the premises leased, this is neither an assignment nor a sublease.

Forfeiture of Lease—Waiver.

12. The waiver of a forfeiture of lease may be by words or acts, including acceptance of rent, or by pleadings.

Semidey v. Central Aguirre.

Agricultural Corporations—Limit of Holdings.

13. A concern which is not a corporation is not liable to the joint resolution of 1900 forbidding agricultural corporations to hold or control more than 500 acres of land, and any such violation of law is to be taken advantage of by the United States, and not by a private party.

Irrigation Rights—Essence of Lease.

14. The Spanish law of irrigation is a very old and highly developed system, and in force in Porto Rico. Where a lease covers a concession of water, anything impairing the franchise goes to the essence of the lease.

Franchise—New Water.

15. Where new water is brought into an old canal and then taken from it, this is not a diversion of the old canal water so as to affect the franchise.

Estoppel—Misleading Another.

16. Estoppel applies only where one party has acted upon the misleading statement of another. In such a case the party misleading will not be allowed to disturb the innocent party. Estoppel, however, does not apply where there has been an honest misstatement of a party's right which has not been acted upon by anyone else to his injury. If it has been acted upon to the extent of court costs, these will be ordered repaid.

Irrigation Water—Diversion.

17. If irrigation water provided for by a lease has been diverted from the leased premises, this is a substantial violation of the lease, but not if by a party who has acquired the right to use all the concession water, and in using it all he applies it in different proportions to land covered by the irrigation concession.

Irrigation Water—Forfeiture.

18. The Spanish irrigation franchise was a system carefully worked out in the law of waters and in the Civil Code. It was under the Spaniards, and is now under the Americans, subject to forfeiture only by the government, and a landlord claiming such a breach by the lessee must prove the same grounds of forfeiture that the government must.

Extension of Lease—New Instrument.

19. Where a lease gives the lessee the option or privilege of a renewal, and the lessee expresses his election by a notarial act within

Semidey v. Central Aguirre.

the proper period, a new lease is not necessary, and a declaration by a court having jurisdiction of lessor and lessee will be sufficient.

Opinion filed March 27, 1915.

## Statement of Facts.

The bill in this cause was filed January 9, 1912, setting up that on July 30, 1901, the complainants leased a certain property of 734.31 cuerdas, known as the hacienda "Teresa," in the district of Guayama, Porto Rico, to the defendant Central Aguirre Company for the term of ten years from August 1, 1901, with the option or privilege of renewal for the further period of ten years, the lease setting out the full description of the terms of the contract being annexed as Exhibit "A." That among the appurtenances and rights covered by the lease were those to a certain irrigation concession of a canal granted by the local Spanish authorities in 1861 to Pascual Semidey, father of the lessors, and the owners of the haciendas known as "Aguirre," "Carmen," "Amadeo" and "Teresa," and confirmed by the government of Spain in 1868. That an essential condition of this concession is that the waters are inseparable from the haciendas for whose use they are granted. A copy of the concession is annexed as Exhibit "B." That in 1905 the defendant, without consent, assigned the lease to Jeremiah Smith, and he the next year assigned to Frazer, Rogers, and Noyes the lands, but excluded the rights acquired to the Central Aguirre Company in a certain canal for the conveyance of irrigation waters. That the main canal to the Teresa was closed, and the defendant company contracted with

Semidey v. Central Aguirre.

defendant González to construct a new canal to irrigate other lands of his own, tapping the main canal above the intake to Teresa. That said defendant company not only failed to keep in repair the fences, but maliciously removed and destroyed the greater part thereof. An amendment of July 17, 1913, adds that said defendant further violated the lease by permitting a large number of squatters to enter and build more than thirty houses, occupied by upwards of one hundred and fifty persons. The original bill further alleges that, upon the expiration of the ten years' term, complainants, on August 1, 1911, gave notice to defendants and their agents to surrender the same. That the lease has not been renewed, nor have complainants received any rent for any new period. That Noyes is in the physical possession of the lands under color of the above instruments, and also one executed in 1911 by defendant Jeremiah Smith, pretending to grant a renewal of said lease for ten years. That the defendant company has placed the property out of its apparent control by agreement with Smith in order to evade the joint resolution of Congress of May 1, 1900, prohibiting corporations from owning or controlling more than 500 acres of land. That said defendant company further owns and controls other haciendas, similarly held by Smith and others to the same design. That complainants have never given the lessee or anyone else permission to assign the lease. That said defendant company has utterly disregarded the rights of the owners, and, unless restrained by injunction, the said owners will never have any permanent security. That in 1899 agents of said company walled up the subcanal of the Teresa, and actions of injunction and for damages had to be brought, and in which complainants were successful, but that at first

Semidey v. Central Aguirre.

said defendants refused to obey the decree until enforced by police, an overwhelming force, and that in the suit for damages said defendant company paid the complainants $1,500. That in the lease permission was granted to put in a pumping station, and this was carried out. That in 1907 defendant González, by contract with said defendant company, tapped the main canal and carried the water to other lands on which he raised cane, and supplied the same to the said defendant Central Aguirre, upon which said owners of the Teresa made formal protest and brought a suit for summary disposition in a local court, which was removed by the defendant company to the Federal court. That therein said defendant filed an answer confessing that the incorporated company did authorize the said González to take the waters in the irrigation of his lands, but that, when advised that they had no right to do so, they annulled the contract with González and permanently closed the canal, which was assented to by said González. That thereupon, in view of such statement and of the necessity that further proceedings must be in equity, complainants by leave of the court withdrew said action without prejudice. That, however, said canal was not permanently closed up, but has remained open to this day. That the matter at issue is of the value of more than $10,000. The bill, therefore, prays that the lease be declared terminated as of July 31, 1911, that the sublease by Jeremiah Smith of 1911 be declared null, that defendant vacate said hacienda Teresa, that account be taken of the profits, that the damages be decreed to complainants, and that damages growing out of not repairing the canal, and removing and allowing squatters, be ascertained and decreed, and also recovery of documents, temporary injunction, for costs

VII. Porto Rico—37.

of the action, and for other and further relief. A demurrer to the bill was overruled July 29, 1912. A joint answer was filed September 2, 1912, denying many of the allegations of the complaint. The admission of the answer is an admission that defendant Central Aguirre Company is a corporation duly registered and authorized to do business in Porto Rico, that the Central Aguirre as a copartnership made a deed in 1905 assigning the Semidey lease to defendant Smith, and registered the same, that Smith in 1906 assigned or sublet to Frazer, Rogers, and Noyes, and that Exhibits "B" and "C" of the bill are practically correct. The answer denies that there is any separation of the Teresa from its water rights, that the company in any way closed the Teresa subcanal, and denies a confederatio with defendant González. The bill alleges that prior to the lease in controversy, Teresa had not been cultivated, but was devoted to pasturage, with no agricultural product except a few banana trees, and that the lateral or sub ditches to Teresa were out of use and filled up before the lease. That the main canals were completely out of repair and Teresa had not contributed to any repairs. That the Lapa canal was entirely broken and had been for a series of years. That the irrigation was effected from a large pumping plant, and that since release the ditches and canals have been kept in reasonably good condition of repair and maintenance, better than for a number of years prior to the lease. That the González canal was merely to take the equivalent of the water which González brought into the main canal by reconstruction of the Lapa branch, and that this did not endanger or imperil the concession. That, nevertheless, defendant Central Aguirre Company, after notice from complainants, notified defendant González that the agree-

Semidey v. Central Aguirre.

ment was canceled. That defendants Noyes and Smith and the copartnership Central Aguirre, the original lessee, were not in anywise parties to the attempted agreement to allow González to use the said waters temporarily. That the Teresa has since the lease, from time to time, received the waters pertaining to it under the concession, and it has been kept in good condition. And defendants further deny the destruction of the fences, and allege that the fences have merely been changed to meet the new conditions of cultivation. The defendants allege that they will, at the expiration of the term, return the property with fences complying with the requirements of the lease. The answer admits notice to defendant Noyes on August —, 1911, demanding return of the premises, but which was refused, and alleges that defendant Smith as the assignee, with the approval of the original lessee, notified the complainants by a notarial document of the extension of the lease in accordance with its terms. That since such demand for possession rent has been tendered to complainants, and since the above demand for possession has been legally consigned to the district court for the judicial district of Ponce. There the money remains subject to withdrawal by the said complainants, of which facts the complainants have had full notice. The answer denies all acts and intent to evade the joint resolution of Congress of May 1, 1900. That the defendant company was incorporated August 3, 1905, and all its property consists of the manufacturing plant and a tract of about 425 acres of land surrounding its manufactory, upon which it has expended over $3,000,000. The answer denies the allegations as to legal proceedings with De Ford Company, and alleges that the allegations are scandalous and impertinent. That the lease in Par-

agraph XIII. expressly waives all kinds of prior claims against the Central Aguirre. That the answer to the complainants' prior suit in the Federal court was prepared by counsel not properly advised, and was not sworn to by any officer of the company, and was incorrect as to statement of facts, and verified by defendant Noyes, and that the complainants voluntarily dismissed the bill.

An answer was filed August 25, 1913, by all defendants except González, to the amendments of the bill, denying the allegations as to squatters and their houses, alleging that the so-called squatters are working men or peons, who were attendants at will. That defendants did, on July 21, 1913, present, through a notary, to the complainants an offer and proposal to return possession of the hacienda Teresa, without any conditions except that the offer was without prejudice to the lands and right of way offered for a pumping station, subsequently deeded to the company by the complainants. That the proposal was limited to July 24, but that the complainants did absolutely refuse the offer and declined the proposal. That such refusal is a ratification of the possession of the hacienda and forfeiture of any right to cancel the lease. That on the sugar crop for 1913 defendants had expended many thousands of dollars for planting, cultivating, fertilizing, and irrigation. That since then the current rent has been consigned as above. This answer is verified by defendant Noyes, and, while not made a cross bill, prays besides dismissal for other and further relief.

Among the pleadings is a supplemental and amended answer of Manuel González, filed January 30, 1914. He alleges that the former answer does not express the facts, and therefore files this independent answer. He admits many of the allega-

tions of the bill, but alleges that the water concession was aban-doned in 1874, and was therefore lost and forfeited. That no water had been brought down to Teresa for many years prior to the lease, and that the Lapa canal in particular was entirely broken up. That in 1907 González by agreement with Aguirre undertook and did repair the Lapa canal at his own expense at a cost of approximately $18,000, and has since used the waters therefrom. That the canal was walled up by the defendant Aguirre during a previous suit with the present complainants, and that the defendant reopened the canal as necessary to his property, and as rightfully constructed by him under his contract for grinding sugar cane with the defendant Aguirre. He denies all conspiracy and intention of injuring the complainants.

There were numerous motions and proceedings during the course of the case not necessary to be mentioned. On the final hearing November 5, 1914, complainant made certain motions, one being for possession of the property through acceptance of an alleged tender of 1913, and also for a receiver. The court refused these motions, stating that it could grant the same relief, if it seemed proper at all, under the final submission, which was made November 10, 1914.

*Messrs. Perry Allen* and *H. G. Molina* for complainants.

*Messrs. Charles Hartzell* and *Manuel Rodríguez Serra* for Central Aguirre et al.

*Mr. Jorge Domínguez* for defendant González.

HAMILTON, Judge, delivered the following opinion:

1. Upon its face the bill seems to be a suit for the possession

of land against a hold-over tenant, whose defense is that he is
in under a right of extension given in the original lease. This
presents many features resembling a suit for ejectment or un-
lawful detainer, but, on account of cancelation, injunction, and
receiver asked for, this court, through Rodey, Judge, held, on
January 16, 1908, that the matter should go on the equity
docket. This would seem to constitute the law of the case, and
the court is not disposed to revise that ruling. It may be added
that no motion has been presented to dismiss the bill for want
of equity.

2. The complainants argue that, there having been a decision
July 29, 1912, by this court, upon demurrer filed in March of
the same year, by which the court goes into a number of the
points at issue in this case and passes on them favorably to the
complainants, the court is now bound by that opinion and
should, upon this hearing on the merits, come to the same con-
clusion as it did upon the argument on demurrer. It is true
that the change of judge makes no difference in the constitu-
tion of the court. The action of the court upon the merits
should and will be precisely the same as if the same judge had
made the ruling upon demurrer. The present incumbent has
a number of times, upon direct application, declined to re-
verse the rulings of a predecessor; but the point now before the
court is not analogous. The court is not now asked to change
the ruling on demurrer, but to consider anew on the merits
the law applicable to the case. Where there has been a ruling
sustaining a demurrer, and consequently an amendment of the
bill, there can be no doubt that the whole matter is opened up
anew. There being an amendment, the bill is for many pur-
poses a new bill. There might very well be in the amendment,

as well as in the facts proven under it, a fuller development of the case, which would not "preclude the plaintiff from renewing or the court from entertaining the same question of law at the trial." Post v. Pearson, 108 U. S. 418, 422, 27 L. ed. 774, 2 Sup. Ct. Rep. 799. Substantially the same rule must apply where there has been a denial of the demurrer. The fact that there is a "change of judges makes no difference; it is the same court." If it were the same judge he would have the right upon fuller argument to change his mind on the question of law presented. Richman v. Muscatine County, 77 Iowa, 513, 4 L.R.A. 445, 14 Am. St. Rep. 308, 42 N. W. 422.

"As long as the action continues to be pending in the same court, the judgment upon a demurrer to a declaration cannot be considered as absolutely and conclusively final; for, in the exercise of judicial discretion, any question of law upon which an opinion has been expressed may be reopened for further examination; and it is quite immaterial whether such re-examination is allowed in the same form and manner in which the question was at first presented and considered, or arises otherwise in the course of due proceedings upon the trial. There was, therefore, no error or irregularity, since the court was competent, in the exercise of its proper power and authority, to allow it, in permitting the defendants in the original action to avail themselves upon the trial of a legal objection to the maintenance of the action, although a previous ruling upon the question, when the same objection was urged in support of the demurrer, had been adverse to them." Calder v. Haynes, 7 Allen, 387.

"The ruling of the court upon the demurrers had not in any proper sense of the term become the law of the case. It is a

most common occurrence for a trial court to change its rulings during the progress of a trial, upon questions of law, and no one would contend that it is not within its power to do so, or that it should not do so when satisfied that the former ruling was erroneous. A ruling on demurrer occupies no better position in this regard than any other ruling from which an appeal could not be taken, and has frequently been disregarded when the same point subsequently arose in the same case in another way." De la Beckwith v. Superior Ct. 146 Cal. 496, 80 Pac. 717.

If a court should make a mistake of law, it must have the right and opportunity to correct it. This is often done in the progress of a jury trial, and there is no reason why the same principle does not apply in equity. Otherwise, there would be the useless formality of requiring parties to go to an appellate court to correct a mistake which the lower court knows it has committed. As the supreme court of Iowa expresses it, "Parties to a litigation have no vested right in the court's mistakes, to prevent their correction at any time before a final judgment is entered." Darling v. Blazek, 142 Iowa, 355, 120 N. W. 961. It is true that several of the cases above cited are from state courts, but the law is not different in Federal courts. "All decisions made in a former stage of the cause are open for review upon the final hearing" in Federal cases as well. Foster, Fed. Pr. § 298.

It is to be understood, however, that this discussion is simply of the principle, and is not to be taken as implying any change of mind on the part of the court. What is decided is only that upon the final hearing the court will take the whole case into account and decide it upon the merits as presented on

Semidey v. Central Aguirre.

the trial. There will possibly be a disposition to follow conclusions previously come to upon the law, but not upon the theory that they have become in any way the law of the case.

"If the evidence is unchanged, the judge will rarely refuse to follow a ruling made by one of his colleagues in the same or a similar case." Foster, Fed. Pr. § 298.

3. It seems that during the pendency of this case in July, 1913, the defendant Aguirre made an offer to return the Teresa property. This was declined at the time, but the complainants contend that it amounted to a tender which must be kept up, and they accordingly later in open court accept the supposed tender. If the offer in question was technically a tender, and has been kept good, and it is now accepted, that would dispose of the case except as to equities which have arisen in the meantime. Under this latter head would come compensation to the defendants for sums expended on a new crop, and this the complainants aver that they are ready to pay. It is obvious that this point must be decided before anything else can be taken up.

The facts seem to be that in April, 1913, the attorney for the lessees advised the attorney for the complainants that he would file an offer to return the leased premises on the condition that Smith have the right to take off the growing crop, and the complainants release damages. The offer did not constitute any admission of right in the plaintiffs. The settlement never materialized. On July 21, 1913, defendant Central Aguirre Syndicate, original lessee, defendant Jeremiah Smith, and Noyes, made a formal offer through a notary to return the leased premises on July 24, with no conditions annexed. The wording of the offer was that defendants "are willing to yield

to the demands of the plaintiffs that the estate Teresa be va-
cated by the said defendants and turned over to the owners
thereof, and that the lease for the said estate be canceled and
rescinded." The notary certifies that the complainants refused
to accept the offer, but on October 2, 1914, they change their
minds and seek to accept it in court.

This brings up the question, therefore, whether the offer
amounted to a tender. A tender of specified articles vests the
title in the tenderee, and the tenderer, even if the tender is
refused, becomes the bailee of the tenderee. 38 Cyc. 165. The
tender must, of course, be kept up, because the party to whom
it is due has the right to come for it at any time. Town v.
Trow, 24 Pick. 168, 170. The rule as to a money tender is
that the party making the deposit devests himself of all title.
Griffith v. Jackson, 45 Mo. App. 165. But, unlike the case
of specific articles, if a tender is refused the money does not
become the property of the tenderee; the obligation of the ten-
derer is merely to be ready to pay it when requested. Curtiss
v. Greenbacks, 24 Vt. 536, 540. *Secus* as to money tender
deposited in court. 38 Cyc. 176. The creditor, by refusing
to accept, does not forfeit his right to the thing tendered.
Tiffany v. St. John, 65 N. Y. 314, 318, 22 Am. Rep. 612.
He has the privilege to change his mind and accept the tender,
losing any collateral right which he would have had during the
meantime.

The offer in question differed from a tender in that it did
not admit the right of the plaintiff to the object tendered. It
said: "Fifth: That neither the Central Aguirre Syndicate
nor Mr. Jeremiah Smith, Jr., nor Mr. Robert Boutelle Noyes,
herein represented by the party hereto, do acknowledge or

Semidey v. Central Aguirre.

admit in any form or manner the contention of the plaintiffs that the said lease has become void or has expired, nor do they admit either any of the other contentions and claims set up in said bill in equity, but that they are willing to yield to the demands of the plaintiffs that the estate Teresa be vacated by the said defendants and turned over to the owners and heirs thereof, and that the lease for the said estate be canceled and rescinded."

A tender is the act of one in offering that which he deems to be due and owing, an absolute admission that the amount tendered is due. Without this the tender is bad. Wood v. Hitchcock, 20 Wend. 47. There is a difference between the case of money or specific articles on the one side and real property on the other. A tender of a deed does not pass the title to the vendee, unless accepted. This difference is accentuated by the fact that the land in question was valuable principally for its crops. Conditions which existed at one time might not be true at another time. Thus, in the case at bar it is argued that the complainants have changed their mind on account of the rise in the price of sugar, and so that their offer now to repay the expense of planting a new crop does not meet changed conditions at all.

The offer in question cannot be considered as a technical tender for two reasons. In the first place, it has not been duly pleaded as a tender, and the collateral questions connected with it cannot now be appropriately discussed and decided. In the second place, on its face it was limited to July 24, 1913, which had long expired before the plaintiffs endeavored to take advantage of it. The Civil Code of Porto Rico throws no clear light upon the question of a tender of leased property, but the

conclusion above reached independently is strengthened by the legal provision as to a tender of money, even when made or consigned in court. Section 1148 of the Civil Code provides that "until the creditor may accept the consignation, or a judicial decision should be rendered that it was properly done, the debtor may withdraw the thing or amount consigned, leaving the obligation in force." It follows, therefore, that the offer made is not to be considered a technical tender, but was merely an offer of compromise, which was refused.

4. The bill presents the case of a lease by the complainants to one of the defendants on July 31, 1901, of a certain tract of land of 734.31 acres near Salinas in Porto Rico. The term was expressed to be for ten years, with right of prórroga, or extension for another period of ten years upon the same terms. While not expressly mentioned in the lease, the hacienda in question had among its appurtenances the right to use a certain water concession. It is claimed by the complainants that the defendants violated several provisions of the law, including that as to the water concession, and that complainants, therefore, had a right to refuse, as they did on August 1, 1911, to extend the lease, and furthermore to demand its rescission and the return of the property, which is the object of this suit. The different points involved will have to receive separate consideration, but the general law on the subject of relative rights of landlord and tenant is found in the Civil Code, as follows:

"Sec. 1458.—The lessee is obliged:

"1. To pay the price of the lease in the manner agreed upon.

"2. To use the thing leased as a diligent father of a family would, applying the same to the use agreed upon; and in the absence of an agreement to the use which may be inferred from

Semidey v. Central Aguirre.

the nature of the thing leased, according to the custom of the land.

"3. To pay the expenses arising from the instrument constituting the contract.

"Sec. 1459.—If the lessor or lessee should not comply with the obligations mentioned in the preceding sections, they may request the rescission of the contract and indemnity for losses and damages, or only the latter, leaving the contract in force."

"Sec. 1472.—The lessor may judicially dispossess the lessee for any of the following causes:

"1. Upon the expiration of the conventional period or the one fixed for the duration of leases in §§ 1480 and 1484.

"2. Default in payment of the price agreed upon.

"3. Infraction of any of the conditions stipulated in the contract.

"4. When the lessee employs the thing leased in uses or services not stipulated, and which cause the same to be impaired, or when he does not comply, with regard to its use, with the provisions of No. 2 of § 1458."

5. A lease is a form of contract, and under any system of jurisprudence if a contract is substantially carried out there can be no rescission or forfeiture. If small matters were to be regarded as terminating a contract, it would be impossible to carry on any kind of business. Peculiarly is this so under the system of equity jurisprudence. In everything which can be compensated by damages equity leaves the parties to their remedy at law, and this would be as true in suits upon leases as in suits upon any other form of contract. It is sometimes expressed in the words that equity looks to the essence, and not to the form.

Thus, one of the grounds of forfeiture alleged is that certain fences have been destroyed by the lessees. Evidence has been taken to show that these fences were made of tachuelo wood, which is peculiarly durable and now very scarce. The testimony seems to show that there were several hundred cuerdas in length of this fence, worth $20 a cuerda. The damage, therefore, would be several thousand dollars, if this is to be considered at all. There is no doubt that it is the duty of the lessee under the civil law, as well as under the common law, to return the property in substantially the same condition in which he received it. Section 1464 of the Civil Code says that the "lessee must return the estate at the expiration of the lease in the same condition in which he received it, except what may have been destroyed or impaired by time or by unavoidable reasons." This relates to what should be done by the lessee at the termination of the lease, and if not done would be a matter of damages. It cannot be successfully contended that the duty of the lessee "to use the thing leased as a diligent father of a family would" requires him to keep the fences in inconvenient places all the time of the lease. Civil Code, § 1458 (2). On the contrary, the lease itself expressly says that the land is to be used for the cultivation of cane, which would conform to the rest of that section, and permit "applying the same to the use agreed upon, and in the absence of agreement to the use which may be inferred from the nature of the thing leased, according to the custom of the land." It is shown by the complainants' own witnesses that intermediate or interior fencing is not usual on cane lands, as it would interfere with the cultivation of large fields. The most that can be said as to fences, therefore, is that the land must be returned ultimately with as

good fences as at the time the lease was made, or there will be a: legal claim for damages. For the purposes of the present suit,. however, the matter of fences may be disregarded. It is not,. under the facts of this case, a ground of forfeiture.

6. It is the duty of a tenant to avoid what the common law calls waste of the subject of a lease. Under the civil law the landlord, and not the tenant, is required to make necessary repairs (Civil Code, § 1457 [2]), wherein it is the duty of the lessor "to make thereon during the lease all the necessary repairs in order to preserve it in condition to serve for the purpose to which it was destined." This, however, is a condition. which may be evaded by contract, and in the lease in question it was stipulated that the lessee was to make repairs. A ground of forfeiture urged by the complainants is that the defendant Aguirre abandoned the subcanal leading off to Teresa from the point where the other arm of it led off to Carmen. It is shown,. however, that at the time that the Aguirre Central obtained the lease in 1901, there were but two or three earthen drains or ditches on Teresa, leading to small banana, plantain, and tobacco patches. This evidence indicates that these were closed up by the necessary alterations growing out of changing the land from one of such small crops to a sugar plantation, while on the other hand more useful ditches have been opened. Except so far as this may raise the question of the effect upon the water right,. which will be separately discussed, it would seem that this point is analogous to the one above as to fences. In changing an earthen ditch for better purposes of cultivation the lessee cannot be said to offend the law (§ 1460 of the Civil Code) that "the lessee cannot change the form of the thing leased." It may well be that for the future, taking into account the

Semidey v. Central Aguirre Co.

agricultural destiny of Porto Rican lands, the lessee has improved the lands by changing the ditches. But even if this is not so, it is a question which may be relegated to the end of the term and settled at the same time with that as to fences.

7. It is contended that the same principle applies to the squatters' shanties (bohíos) alleged by the bill to have been erected near the sea and at some other points on the property. Civil Code, §§ 1462–3. The contention of the defendants is that these houses belong to employees who are merely tenants at will. If it were proved that the defendants had permitted outsiders to occupy a material part of the land in such a way as to hold against the lessors, it might be a breach going to the essence of the contract. It cannot be said, however, that the plaintiffs' evidence goes so far. It is merely shown that there are small houses on the land, one of them a schoolhouse; but the plaintiffs themselves admit that it is customary for employees to live upon such plantations, and the evidence does not show to the satisfaction of the court that any particular house has been built or is held adversely to the defendants or the complainants. One witness testifies that no house is occupied adversely. The plaintiff must make out his case by a preponderance of evidence in equity as well as at law, and the court does not think that this allegation is satisfactorily proven. It must therefore be disregarded.

8. Neglect to repair is to be distinguished from waste. If any of the matters above discussed shall at the proper time be held to fall under the head of waste, rather than not making repairs, there may be a different measure of damages. Section 278 of the Porto Rico Code of Civil Procedure provides: "If a guardian, tenant, or person holding by title jointly or in com-

mon with others, any real property, commit waste on such property, any person aggrieved by the waste may bring an action against him therefor, in which action there may be judgment for treble damages."

It is not necessary at this time to determine whether any of the damages above alleged amount to waste.

9. The Code of Civil Procedure makes a similar provision as to damages in some cases. Thus, in § 281 it is provided: "If a person recover damages for a forcible or unlawful entry in or upon, or detention of, any building or any cultivated real property, judgment may be entered for three times the amount at which the actual damages are assessed."

It may be doubted whether this section can be enforced in equity, as questions of unlawful detainer are of legal rather than equitable cognizance. However, the facts at bar, no matter in what form constituted, do not relate to a forcible or an unlawful entry upon or detention of any real property at the present time. The question of damages is one which must come up, if at all, at the termination of the lease. It would come up in this court only if the lease is declared forfeited on some other grounds. Several such grounds are alleged, and to their determination it is now proper to devote attention.

10. Of a different class entirely from those relating to damages merely is the allegation that by the contract with Jeremiah Smith in 1905 defendant Aguirre violated a provision which the law reads into every lease against any assignment by the lessee. This at common law was due to the principle that a tenant could not contract himself out of the duties which ran with the land by substituting someone else. At civil law a

different principle applies. There is no question as to that under the Civil Code, §§ 1453–1455, which reads as follows:

"Sec. 1453.—Should it not be expressly forbidden in the contract of lease of things, the lessee may subject the whole or part of the things leased without prejudice to his liability for the fulfilment of the contract executed with the lessor.

"Sec. 1454.—A subtenant, without prejudice to his obligation with regard to the sublessor, shall remain bound to the lessor for all the acts which refer to the use and preservation of the thing leased, in the manner agreed upon between the lessor and the lessee.

"Sec. 1455.—The subtenant shall also be bound with regard to the lessor for the amount of the price agreed upon in the sublease, which is due at the time of the summons, considering the payments made in advance as not made, unless he has paid them according to custom."

The contention, however, is that Aguirre's contract with Smith was not a sublease, but an assignment of the lease.

The argument against the legality of assignment is that this § 1453 of the Porto Rican Civil Code (§ 1550 of the Spanish Civil Code) is subject to the conditions and bases prescribed for the Code commission by the act of May 11, 1888. The first of these was that the Code shall take for its basis the project of 1851, and transitory provision 7 at the end of the Porto Rican Civil Code declares that "cases not directly comprised in the previous provisions shall be decided by applying the principles which served for their foundations." Article 1481 of the project of 1851 contained the provision of article 7 of a law of June 8, 1813, re-enacted on September 1, 1836. This declared that "the lessee can neither sublet nor assign the whole

Semidey v. Central Aguirre.

or any part of the estate without the approval of the owners." It is argued that the codifiers shall be held to have adopted the provision against assignment when they expressly rejected the provision against subletting. This, however, is not at all conclusive. When one provision of a section is re-enacted and another is not, the general understanding is that the omitted section is repealed, and particularly should this be so under the civil law, which aims to express in writing as far as possible all law upon a given subject. It may further be remarked that it would be unfortunate if the above course of reasoning should prevail. The result would be that the almost inaccessible Spanish Code of 1851 prevails in every case not otherwise provided for by the existing Porto Rican Civil Code. It may be seriously questioned whether this could be under the organic act of Porto Rico, which continues in full force and effect "the laws and ordinances of Porto Rico now in force" (in 1900) "except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States."

The court cannot adopt the above theory of the law, but it reaches the same conclusion in another way. *Expressio unius est exclusio alterius;* the authorization to sublet is a denial of the right of assignment of a lease. The two acts stand upon an entirely different basis. A sublease leaves the original lease intact, merely affording the lessee, perhaps, a better facility

for paying rent to the man who continues his landlord; while an assignment would change the contract entirely by substituting a sublessee in the place of the original lessee without the consent of the other parties to the contract.

11. On December 16, 1905, the Central Aguirre by deed "cedes, renounces, and transfers in favor of Mr. Jeremiah Smith . . . the contract of lease, . . . subject to the terms of said contract." This instrument sets forth all the conditions of the original lease, including that the Central Aguirre should not be relieved of liability by a sublease. The question is, Was this deed to Smith a sublease or an assignment?

Q. Mucius Scaevola, the commentator, holds that the basis of the sublease is the reservation of the rights and powers of the original owner. Assignment, he remarks, presents the characteristics of a sale, a sublease those of a lease. A sublease reserves the powers of the lessor as against the original tenant. Commentaries, vol. 10, pp. 486–8. 24–480–488. To the same effect in Manresa, vol. 10, pp. 486–8. The wording of the transfer in Spanish is Cesión de arrendamiento, which might be properly translated as "Assignment of lease." It provides that the Central Aguirre "assigns, renounces, and transfers to Jeremiah Smith for himself, his successors or representatives, the contract of lease hereinabove set forth, he being hereby subrogated to all the rights and rights of action pertaining to the assigning company, and he hereby taking upon himself all of the obligations and duties which, with respect to the owners lessors of the leased estates, the said assignor had contracted pursuant to the terms of said contract," using in the original Spanish the word "cede" at all times. It may be remarked, although not conclusively, that the registrar registered this

Semidey v. Central Aguirre.

paper as legal, which he would not have had the right to do if it had been a technical assignment. It seems to be proved that the rent was always paid by the defendant Central Aguirre, although from proceeds of subrentals of Teresa, and also the complainants seem not to have known of any change of tenants. In the bill, complainants say the transfer was only "colorable." The law leans to such a construction of an instrument as will make it legal rather than illegal. Equity looks to substance, not to form. The court is unwilling, in view of this contemporaneous construction of the paper, to consider it a strict assignment, which would make it illegal. It was rather in the nature of an appointment of an agent or trustee, which is legal.

12. It is argued that, even if the paper were illegal and constituted a ground of forfeiture, the complainants waived their rights in this regard by accepting rent after knowing all the facts. The instrument to Smith was dated December 16, 1905, and afterwards the plaintiffs, on September 27, 1907, filed a suit against the Central Aguirre for possession of the property on this ground. Subsequently that suit was removed to this court, and plaintiffs voluntarily dismissed it.

On July 3, 1908, Francisco Semidey, the managing plaintiff, petitioned the executive council and unsuccessfully complained of this lease to Jeremiah Smith. Plaintiffs admit receiving a letter 1907 mentioning this transfer. Nevertheless, despite knowing of this alleged assignment, complainants continued to receive rent to July, 1910, that is to say, for a period of four years afterwards. The rule unquestionably is that receiving rent with knowledge of a breach is waiver of the forfeiture. Dermott v. Wallach (Ingle v. Wallach) 1 Wall. 61, 17 L. ed. 680. Indeed the general principle is that any act of

the lessor done with knowledge of a cause of forfeiture by the lessee, admitting the existence of the lease and recognizing the lessee as tenant, is waiver of such forfeiture. Forfeitures are not favored, and slight acts will be construed to waive them, particularly if the tenant be known to have been making repairs or has otherwise incurred expense based upon his tenancy. The waiver may be by words or acts, including acceptance of rent, or pleadings. 24 Cyc. 1360, 1361.

It would seem, therefore, to be proved that the complainants had knowledge of this instrument to Smith, and, even if it were construed as an assignment, they assented to it, and cannot now be allowed to assert illegality in the instrument.

13. The bill alleges that the transfer by the defendant Aguirre to Jeremiah Smith in 1905 was merely designed to avoid the joint resolution of Congress of 1900, forbidding an agricultural corporation from owning or controlling more than 500 acres of land. It is not clear what is the object of this allegation, unless that the fact is to be considered as a ground for forfeiture of the lease. It will be necessary to ascertain what are the exact facts, and then what is their legal effect.

The testimony of defendant Jeremiah Smith and others seems to show that on July 1, 1899, capitalists in Boston entered into an agreement by which they formed a syndicate known as the Central Aguirre, making the firm of De Ford & Company their agents, and providing that a majority in interest should control the affairs. This was before the passage of the joint resolution of Congress, which, therefore, could not apply to it, and, moreover, the agreement expressly constituted an association or syndicate, and not a corporation. The syndicate acquired title to lands, including the original Aguirre property,

Semidey v. Central Aguirre.

from Lafuente in the same year, then erected a sugar mill thereon, obtained control of a local railroad from Ponce to Guayama, and leased Amadeo and Carmen. In 1905 the concern was reorganized. A new association, generally spoken of as a trust, was formed, called the Central Aguirre Sugar Companies, which had general control over all business of the original enterprise. A corporation called the Central Aguirre Company was organized, which received the title to the mill and 425 acres of land. To secure control of the corporation, its stock and that of the railroad were placed in the Central Aguirre Sugar Companies, to which also were assigned all lands and leases of the old syndicate. The title to all lands was placed in certain eleven trustees, but to prevent inconvenience from having so many holders, the real estate was transferred to Jeremiah Smith, a young Boston attorney, who in turn executed a declaration of trust, declaring that he held the property for the above trustees. It was in connection with this arrangement that the Teresa lease was transferred to Smith.

Such being the facts, does this assignment conflict with the joint resolution of Congress?

In the first place it would seem that the complainants are mistaken in the character of the organization which owned or controlled the Teresa land. Even if this, together with the other property owned, exceeded 500 acres, the organization in question was not a corporation, and so does not come within the purview of the joint resolution. Eliot v. Freeman, 220 U. S. 178, 55 L. ed. 424, 31 Sup. Ct. Rep. 360. It may be against the policy intended by the resolution, but the court can go no further than its phraseology.

Furthermore, it is not for the complainants to take advan-

tage of this violation if it existed. It may be doubted whether, under the facts of the case, the complainants did not assent to the arrangement. It was as true when complainants made the original lease to the defendant Aguirre as it was afterwards that defendant was coming into control of more than 500 acres of land.

In the third place, however, it has been settled in this and other courts that such violations of law, if they exist, are to be taken advantage of only by the Sovereign; that is to say, in this instance, the United States. Fritze v. Esperanza Central, 5 P. R. Fed. Rep. 2; Compañía Azucarera de Carolina v. Registrar of Property, 19 P. R. R. 143, 152; Seymour v. Slide & S. Gold Mines, 153 U. S. 523, 38 L. ed. 807, 14 Sup. Ct. Rep. 847.

14. On the other hand, acts of the defendant in regard to the irrigation rights of the property leased are of the essence of the contract. The court judicially knows that the south side of Porto Rico differs from the north side in having a much smaller rainfall, and that the irrigation from the rivers and other streams is, on the south side, of the greatest importance. Land without such water is almost worthless, and the allegations of the bill that the defendant Aguirre has impaired, if not lost, the water rights of Teresa, must be carefully considered. The insular government has lately instituted a system of irrigation which has features peculiar to itself, but the rights of the parties to this suit arise from Spanish law. The condition in Spain itself was not unlike Porto Rico. While the Castilians, who became the rulers of the greater part of the peninsula, lived in rocky and not productive mountain country, the Moors inhabited the fertile South, and in connection with the Guadal-

quivir and other rivers there developed a wise system of irri-
gation. It came, perhaps, in turn from Egypt and other east-
ern countries with which the Saracens had been in contact, but
developed into a system unequaled in Europe. Even the Span-
iards from the North retained the Moorish irrigation and its
laws upon the expulsion of the Moors. This was as true when
King Jayme drove the Moors from Valencia as when Ferdi-
nand and Isabella expelled the last remnant of the nation from
Granada. Walton, Civil Law, 63. New regulations were nec-
essary from time to time, and those governing the case at bar
are found more particularly in the Spanish law of 1868, whose
principles, if not its text, are still in force. This provides for
government concession of the right to use the waters from local
streams, and where this is granted to several persons they have
the right of arranging between themselves as to the time and
other incidents of use of the water. In the case at bar, it
seems that in 1861 the local Spanish government made such a
grant of the waters from the two streams known as the Lapa
and Majada rivers to the proprietors of certain six plantations
in the neighborhood of Salinas. Two of these seem not to have
used their rights, or at all events drop out at an early date, leav-
ing the owners of Amadeo, Carmen, Aguirre, and Teresa as the
persons and lands interested. It was a fundamental require-
ment of the law that the water could not be separated from the
land, that it was, to use the common-law expression, in the na-
ture of an easement running with the land, and such diversion
was ground for forfeiture. In practice this has not been held
to require that all the concessionaries must always use the water.
In this very case, two concessionaries have disappeared entirely,
and all the water is used or claimed by the remaining four. It.

resembles somewhat the common-law rule of joint tenancy. The requirement only is that all the water shall be used by the concessionaries, although between them they may perhaps arrange that only one may temporarily enjoy its use.

15. Before considering the defense by Aguirre, a question of practice must be taken up. It is shown by the evidence in a previous suit in this court between Aguirre and these complainants, the defendant Aguirre filed an answer by their present solicitor admitting that Aguirre had no right to divert water to the lands of defendant González, which are not covered by the water concession, and that Aguirre, therefore, had itself walled up the Ganzález intake. Shortly thereafter complainants dismissed their suit, although the parties differ as to the cause of dismissal. Complainants say that they dismissed because of this allegation in the answer, while Aguirre contends that the dismissal was because the complainants were dissatisfied with the Federal judicial procedure. Aguirre, on the other hand, now contends in the answer in the present suit that they had a perfect right to permit the diversion by González, because the water diverted was brought by González himself at his own expense from the Lapa river, which, at the time of the lease and for many years before, had not been supplying any concessionary water. They allege, and it seems to be proved by the evidence, that the Lapa canal had been broken down by the San Felipe tornado in 1878, and had from that time passed out of existence for irrigation purposes. That the owners of Teresa had never made the slightest attempt to rebuild the canal, either alone or in conjunction with the other concessionaries, and had in fact declined to participate when Aguirre planned to do so. That Aguirre was on the point of rebuilding this

Semidey v. Central Aguirre.

canal, which required either an aqueduct over the lower Lapa channel or a siphon under it, when another tornado, that of 1898, commonly called San Ciriaco, caused further damage. The estimated cost of the restoration was $5,000, and Aguirre did not think it worth while spending so much money at that time. Such was the condition of affairs when the syndicate leased Teresa from the complainants in 1901 as a part of the extension of their field of operations, begun by the purchase of the old Aguirre finca in 1899. In this connection came in 1906 an arrangement by which defendant Manuel González, who owned adjoining lands not covered by the concession, was furnished Aguirre, which had now become one of the modern centrals of the island, with cane to be raised on his land. To aid him in raising the cane defendant Aguirre agreed that he should make the required restoration of the Lapa canal and bring its water down the old joint canal to a point near his land, from which point he built a canal for his own special purposes. This González did at his own cost, amounting to several thousand dollars. The contention of defendants Aguirre and González is that the amount of water so taken was 26 per cent of the total flow of the joint canal, and that this was, as found by measurement, the exact amount of water which González had brought into the canal higher up. If González had brought the Lapa water by a viaduct or otherwise over the old channel to his fields, he would have done exactly what the contention of Aguirre is that he did do practically. The only interest that complainants can have in the transaction under this theory, therefore, is that the joint canal was used for the flow of the new Lapa water for the space of several kilometers, which would have been only a technical misuser, and not have been a ground for forfeiture.

Semidey v. Central Aguirre.

It would seem that this reuse of the Lapa water did not injure the complainants in any way cognizable in this suit. It is true that in 1900 De Ford unsuccessfully attempted to procure a concession of his own for this water. Whether or not the old concession had lapsed, the complainants were not damaged by the restoration of the Lapa canal, and at all events it would be an injury which cannot be taken into account under the bill at bar.

16. The complainants claim, however, that the defendants, particularly Aguirre, by their answer filed in the previous suit in this court, have admitted that the González diversion was illegal, and in fact a violation of the lease to Aguirre. If true, this must be either on the theory that the new inconsistent defense is a departure, or that the defendants are estopped from showing the true facts.

A departure, however, is only where a party sets up a right inconsistent with that alleged in his previous pleadings in the same case. Stephen, Pl. 413. This suit is in no sense of the word the same case, and so the principle of departure does not apply.

The question of estoppel, however, is more complicated. It may apply to a different suit. An equitable estoppel applies to land only in chancery. Goodman v. Winter, 64 Ala. 411, 38 Am. Rep. 13. Under the civil law a lease is in the nature of a real right. Under certain circumstances, its registration is provided for, as in this case. An equitable estoppel shuts the mouth of one misrepresenting facts, although he gains nothing. David v. Shepard, 40 Ala. 587. A party cannot defeat one suit by setting up a certain state of facts, and then in another suit based on that aspect of the case deny the existence of

Semidey v. Central Aguirre.

facts as so set up. Hill v. Huckabee, 70 Ala. 184, 188. It may thus apply to inconsistent court proceedings. It, however, does not arise in equity on honest acquiescence in a mistake, unless this had led to some positive act which misleads another. Bispham, Eq. 355. The principal point, therefore, in estoppel is the misleading of another. It arises only where the other party has done something which the party causing it should not, in equity, be allowed to disturb.

It seems to be shown in the case at bar that there was an honest misstatement of defendants' rights, and it is not shown that complainants acted upon this misstatement to their injury, except possibly to the extent of court costs. The suit in which the answer in question was filed was dismissed without prejudice, and complainants have now brought another suit to the same effect and proceed upon the same grounds; and the matter of reimbursement of the costs of the other suit can be adjusted in this. Complainants have not been misled, and it is not apparent that the principle of equitable estoppel should be applied. The defendants, therefore, have the right to set up in their answer in this case a different defense from that in a previous case, which they satisfactorily show was due to a mistake of their solicitor in his pleadings, and not acquiesced in by them as a statement of fact.

17. The reasoning as to the Lapa water would not be applicable to any diversion of the Majada water from Teresa, because this was either in use or at least in contemplation in the lease itself, which provides, under clause 5, that "the repairs necessary to maintain the finca in suitable condition for the cultivation of cane, as likewise for the preservation of the house therein existing, and of the irrigation canals (los canales de

Semidey v. Central Aguirre.

regardío), shall be made by the Central Aguirre." The allegation of the bill, waiving the question of the González diversion, is that the irrigation water coming to Teresa at the time of the lease was shut off from Teresa and used otherwise by Aguirre. Evidence of the Semideys tends to substantiate this claim. They testify that water coming down to the partidor, or sluice gate, regulating the supply betwen Carmen and Teresa plantations, was in actual use and reached Teresa at the time of the lease. That they had used this water for the cultivation of bananas, plantains, and tobacco, and with the lease turned over the main canal leading from this partidor, as well as subordinate ditches on Teresa, and that the canal and ditches were closed by Aguirre, and allowed to grow up. There is little doubt that in 1899 the agents of Aguirre cut off the Teresa water, and that after injunction proceedings in the local court it was turned back on Teresa and damages paid for cutting it off. This was before the lease of 1901, and, in the lease all previous claims between the parties were waived.

The complainants claim that, apart from the González matter, the defendant Jeremiah Smith separated the use of the concessionary water from the use of Teresa when he made a sublease to Frazer and Rogers. Defendant Noyes afterwards became a partner with Frazer and Rogers and has now succeeded to their interest. This arrangement was originally by a private conveyance, dated July 30, 1901, and by agreement was made a public document March 30, 1906, and contains the following provisions:

"Fifth. All the repairs necessary to maintain the leased estates in condition suitable for the cultivation of cane, and also for the preservation of the dwelling house thereon existing, and

Semidey v. Central Aguirre.

to preserve the said estates, their accessories, and improvements in the condition in which the sublessees shall receive them, shall be made by the latter, at their own expense; as likewise the repairs to that part of the irrigation canal which the said sublessees may use with the consent of the sublessor.

"Sixth. The rights acquired by the Central Aguirre Company from Messrs. Semidey Brothers in a certain canal for the conveyance of irrigation waters are hereby expressly reserved to said Central Aguirre Company, which shall hold said rights, and also its successors and assigns, with power to use and employ the same. And in like manner, all rights of way, or any other easements whatsoever heretofore exercised by the Central Aguirre Company, over the estates which are the objects of this contract, said company shall continue to exercise hereafter, as also its legal successors and assigns."

There is considerable evidence to show that practically all the water which was not used at first by Aguirre and afterwards by Amadeo went to the Carmen estate. It seems that the Carmen branch canal was at a lower level and would take all the water, unless it was actually cut off by diversion to Teresa, which was not usually done. The necessities of agriculture on this part of the Island were such that the concessionary water was insufficient on account of variation due to drought and other causes. As Teresa was turned into a modern sugar plantation, and thus needed much more water than before, it was expedient to install steam pumps. At first, pump water was thus obtained on the neighboring Godreau estate and this water was taken over the concessionary canal to the Teresa subcanal and thus brought to Teresa, and in 1907 a pump was installed on Teresa itself. For these reasons the concessionary water was

Semidey v. Central Aguirre.

not much used on Teresa, and the canals were apparently kept up on it, as a witness indicates, mainly to hold the water franchise.

Defendant insists that this 6th section of the sublease refers to the pump and its canals provided for in the original lease from Semidey and actually built in 1906. But the evidence shows that this water was actually used by Noyes on Teresa, and not that it was withheld by Aguirre, while, until after 1906, the concessionary water was largely used by Aguirre or its representatives above Teresa. The provision would seem, therefore, to refer to the concessionary water and its canals. But if this was a violation of the Semidey lease or franchise, it was corrected before this bill was filed in 1912. Indeed, the sublease itself was canceled and the land and water back in Smith's hand before the filing of the bill. Noyes, the actual manager of Teresa, testifies that not only was this separation of land and water not his understanding of the sublease, but in 1910 he required that concessionary water be brought down the canal, and that it was so brought and thereafter used on Teresa regularly ten days in each month. By the notarial act of Notary Ramos in January, 1911, it is shown that the water was at that time flowing to Teresa. Complainants' witnesses testified that the canal seemed in 1912 to be new, but this appearance is explained as due to repairs. On the whole it cannot be said that the allegation in the bill charging separation of the land and concessionary water has been substantiated. It may be noted in passing that this instrument was in form a sublease, and so does not need any consideration as being in any way an assignment.

18. In one form or other, the bill alleges that the defendants

Semidey v. Central Aguirre.

have forfeited the water concession to the Lapa and Majada rivers, one or both, which gives the land leased its real value. This is saying that in a suit by the government the acts of the lessees would be declared to have forfeited the concession in their hands. Necessarily this puts the complainants in the attitude of proving for the government a forfeiture of the concession. The local government is not a party to this suit, and therefore this court cannot, as against that government, pass upon the question in such a manner as technically to bind the public authorities. They, too, are entitled to their day in court; but they are so entitled in a public capacity, and not as individuals having property rights. The facts being proved, the local government is as much bound by the law as an individual suitor, and while a court cannot, against a government not made a party, pass upon a concession so as to bind these authorities, it can and must declare the law upon any state of facts coming before it. The principles so fixed become a precedent, and, the facts being the same, will be followed in other suits, no matter who are parties.

In the case at bar the owners of certain plantations obtained from the local Spanish government in 1861 a concession for the use of the waters of the two rivers in question. This was in 1868 confirmed in a final concession by the government of Spain, by which the rights in question became subject to the Spanish law of August 3, 1866. A summary of the law in Spanish times may be stated as follows:

The use of public water was acquired (among other means) by administrative franchise, and the limitations, rights, and obligations thereunder were those which result from the terms of the concession. Spanish Civil Code, arts. 609, 557, 558.

VII. Porto Rico—39.

The governor could not grant more than one concession at one particular intake, of which the dam forms part; and there existing a concession under vested rights, no new concession could be granted except for the surplus water, after proper gauging of the amount of water flowing through the river bed in normal years. Law of waters, arts. 187, 189.

Collective franchises for irrigation purposes granted to property owners were perpetual (subject to forfeiture for twenty years' nonuser). The law respected rights vested prior to its promulgation, they being under the safeguard of the state and exempt from reprisals, seizures, and embargoes, on account of war, including the capital invested by foreigners in the construction of works or the purchase of lands covered by a franchise for an irrigation canal. Law of waters, arts. 188, 257, 163. Spanish Civil Code, 424.

Rights were transmitted by succession or by contract (Civil Code, art. 609), and, in the irrigation existing, governed by rules either in writing or customary of an irrigation community. No one could be prejudiced or disturbed in the use of the water assigned to him, through the introduction of any change in the amount, use, or distribution of the waters in the irrigable zone. Spanish law of waters, art. 234.

The right so conceded is what is technically known as a franchise, that is to say, a right as to public matters, here river water, which can be conferred only by the government, and therein differs from the ordinary rights of property. It does not differ in any essential particular from other public franchises. The most usual of these is that conferred by incorporation, as in the case of railroads, and is a contract with the government, which, under the Dartmouth College Case, will be protected.

Semidey v. Central Aguirre.

Under the law of 1868, as amended, that of June 13, 1879, regulation and supervision were conferred upon the local authorities and upon the minister of the Spanish colonies (ultramar). These provisions were extended to Porto Rico by a royal order of April 5, 1886, and it is unnecessary to determine how far they were implied in the concession of 1868 itself. There is no question that supervision and visitation remained in the government. After American occupation these governmental functions were vested by a local law of March 12, 1903, in the commissioner of the interior, and particularly in the executive council.

How this concession was managed is shown by the facts of the case. The concessionaries divided the use of the water by turns, according to agreement, and after one of the concessionaries, Aguirre, came into control of all the concessions, it used the water as it saw proper. Perhaps little came to Teresa, which was the furthest off of the plantations, but there seems to have been occasional repair, and from 1910, if not earlier, actual periodical use of the water.

As forfeiture of this franchise could only be by the government, the action of the government, even after this suit was brought, is material in the case.

In the year 1899, and thus before they were bound at all by the lease, De Ford and Aguirre applied to the commissioner of the interior for Porto Rico for the Lapa franchise. Notice was given in the usual form, and the application was opposed by Semidey, representing Teresa, Antonetty, representing Carmen, and Amadeo, representing his own plantation, and they exhibited, amongst other papers, the agreement of March 14, 1861, based on their concession of the Lapa and Majada waters;

declaring how meetings should be held and conducted for the administration of this grant. De Ford & Company, on July 11, 1899, withdrew their application, stating that they had found that Antonetty had in 1893 repaired the canal, and so the twenty years' prescription necessary to forfeit the grant had not expired.

Next, in 1908 the Semideys brought their differences with Aguirre and González before the executive council, and this body declined to interfere on the ground that it was a private matter for the courts. The authorities about this time had an agent examine the canals. Under the late law, constituting an Irrigation Commission and turning over all matters connected with it to that body, the Commission has adopted and is carrying out an extensive irrigation scheme for the south side of the Island, and they have not interfered with the double concession at bar. A representative of the body testifies as a witness that they do not intend to do so. The Irrigation Commission has gone further, and by a resolution passed August 13, 1914, expressly declares:

"1. That the Irrigation Commission should recognize the concessions derived from the rivers Lapa and Majada as valid and subsistent, and

"2. That said concessions be let to stand in their present condition, that is, that the lands which possess them should continue making use thereof as originally granted."

So that, by refusal to interfere and by express declaration, the public authorities having charge of the irrigation have recognized and ratified the Lapa-Majada water concession and the acts of the parties thereunder, and the parties have acted on this, both before and since the beginning of this suit. These

facts being so, the court will also act upon this recognition by the government. The complainants, in attempting to show any acts authorizing forfeiture, have failed, while on the other hand, express recognition by the public authorities is in evidence. The concession therefore, both as to the Lapa and Majada, is a valid concession and now in force for the benefit of the representatives of the four estates to which the concession was originally made. The Semideys, Aguirre, González, and all other defendants, being before the court, are bound by the proceedings in this cause, including the declaration that said franchise is in force as above. In this cause, therefore, the court finds that, so far as defendants are concerned, Teresa has the right to the water declared in the concessions of 1861 and 1868, made exhibits to the bill, subject to the lease of 1901, now extended.

19. The contention of the defendants is that under article 2 of the original lease they have the option, which they have exercised, of extending the lease for a second period of ten years. That article reads as follows: "The duration of this contract shall be ten years counting from the 1st day of August next, with the option or privilege of the Central Aguirre to a renewal (de prorrogarse) thereof for ten years more under the same conditions."

The complainants have contended that this option requires the execution of a new lease. This, however, does not appear to be necessary. The original contract extends itself provided the lessees so elect, and they have duly expressed their election by the notarial act of 1911 in evidence. The matter now being in the hands of the court, all that is necessary can be expressed in the decree.

It follows therefore:

1. That, upon the main contention of the complainants that the lease of July 31, 1901, be declared forfeited or otherwise terminated, and that damages should be allowed them for unlawful detention of the land, they are not entitled to relief, and that, on the other hand, the lease should be recognized as duly extended for the second ten years according to its terms.

2. That the complainants are entitled to the annual rents heretofore consigned from year to year by the defendants in the local court at Ponce, and should receive the same.

3. That the action of defendant González in restoring the Lapa canal and the flow of the Lapa waters should and does inure to the benefit of the original concessions, including the hacienda Teresa, and shall revert to the owners or representatives thereof at the end of the renewed lease term as above declared, and that said Lapa concession is properly used by said González in the meantime, but he holds in trust accordingly.

4. That defendants shall refund to complainants the amount of costs taxed against and paid by complainants in No. 226 in equity in Ponce as a part and condition of this decree, and that the costs in the present cause be divided and paid equally by the complainants and by the defendants herein.

A decree will be entered accordingly.

## Final Decree.

Now on this day the above-entitled cause coming on before the court for entry of final decree therein, and the said suit having been heretofore duly heard and submitted, and the court having heard all of the evidence in the said cause pro-

duced upon the final hearing thereof, and having duly considered the same, together with the arguments of counsel therein, and having heretofore announced the conclusions reached by the court in the premises, and the court being now fully advised in the premises, and, upon full consideration thereof, the court finds as follows:

1. That the offer to return the property to complainants, which was made under notarial act in July, 1913, did not constitute a technical tender, but was merely an offer of compromise, which was refused by complainants, and cannot be accepted or enforced at this time.

2. That the condition of the fencing on the leased premises at and prior to the commencement of this action was not such as to justify or authorize a decree of forfeiture of said lease, that the duty of defendants under the lease is to return the property with the fencing in as good condition as when the property was taken under the lease, and that in default thereof that defendants would be liable in damages for any default or deficiency in this regard.

3. That the evidence shows that defendants closed or altered and changed the earthen ditches existing on Teresa estate at the time of the lease, and constructed other canals and ditches upon and pertaining to said premises suitable to serve for the purpose of the cultivation and growing of sugar cane thereon, and that such changes or alterations are not grounds for the forfeiture of the lease, and defendants may restore same to their original condition at the termination of the lease.

4. That the evidence does not justify any finding that defendants have permitted any of the leased premises to be lost, or threatened with loss, by reason of any acquisition of squat-

ters' right or adverse title from the occupation of same by shanties or buildings. That the evidence shows that it is customary to construct and occupy such houses, and the evidence does not show that any such employee or squatter pretends to occupy any such structure by adverse possession.

5. That the question of the measure of damages to be allowed in cases of waste by a tenant does not arise in this suit, and that any allowance of damage in case of a forfeiture could only arise after such forfeiture has been declared.

6. That under the laws of Porto Rico and the terms of the lease in controversy, the same could not be legally assigned by the lessee.

7. That the contract of December 16, 1905, between the lessee and Jeremiah Smith, Jr., did not constitute a strict assignment of the lease in question, but was rather in the nature of an appointment of an agent or trustee of said property.

8. That even if it should be held that said contract constituted a strict assignment, and consequently a breach of the terms of said lease, the same was fully waived by plaintiffs, by the receipt and acceptance of several annual payments of rental after they are shown to have had knowledge of the existence of said instrument.

9. That neither the lessee Central Aguirre Syndicate nor its successor, the trust under the name of Central Aguirre Sugar Companies, was or is a corporation, and therefore that they are neither of them subject to the limitation provided in the amendment to the Foraker law by which agricultural corporations are restricted to the ownership and control of not to exceed 500 acres of land in Porto Rico.

That in any event, if any violation of said provision should

appear, that the same could only be taken advantage of by the government through its proper officials.

10. The court finds that the water concessions from the Spanish government now in existence are largely controlled by the Spanish law of waters of 1868, the principles of which are still in force; that of the six original grantees named in the Spanish concession of 1861 and 1868 of water from the Lapa and Majada rivers, two of the said concessionaries have been eliminated, and that all of the waters pertaining to said concessions have been utilized by the remaining four concessionaries by virtue of agreement of those controlling the use of the same.

11. The court finds that the agreement of 1907 between the treasurer of Central Aguirre Company and Manual González, providing for the temporary use by González of waters to be brought by him from the Lapa canal due to the restoration of said Lapa canal by said González at his own cost, did not injure the complainants in any way cognizable in this suit.

The court finds from the evidence that the said Lapa canal had not been used for irrigation purposes from the year 1878, when the same had been broken down by a tornado, until the same was rebuilt by González in 1907 under the said agreement, and that such restoration of said canal and the temporary use of the water therefrom by González did not cause any injury to complainants or their property which could be considered in this suit.

12. The court finds that the filing of the answer of Central Aguirre Company in a previous suit in this court, wherein it was admitted that the so-called González diversion was illegal, cannot be pleaded in this suit as an estoppel; that complainants

were not misled thereby to any loss in excess of the legal costs paid by them in that suit, and which may be recouped to them in this suit.

13. The court finds that up to the year 1910 the Teresa property was largely irrigated by pump water from pumps situated on the Godreau and Teresa estate, but that any failure of defendants to comply with any of the provisions of said lease by the application of water from the Majada canal to the Teresa property was corrected prior to the bringing of this suit, and that after 1910 the said estate received all of the irrigation water from said concessions to which it was entitled.

14. The court finds that the use of the concessionary waters under the grants of 1861 and 1868 has not given rise to any cause for the forfeiture of the same, and that this has been so declared by the public Irrigation Commission.

That the Irrigation Commission, being duly authorized thereto on August 13, 1914, by resolution, duly declared said concessions to be valid and subsistent, and the court finds said concessions, both as to the Lapa and Majada rivers, to be valid and in force as to the four estates which have succeeded as to all rights thereto, and that the Teresa estate is entitled to all of its rights under said concessions.

15. The court finds that the grantees under said lease had the right to elect to extend the same for a second period of ten years, and that such election was duly made by a proper notarial act introduced in evidence.

It is therefore ordered, adjudged, and decreed by the court: That the cancelation or rescission of the lease of July 30, 1901, as extended for the additional period of ten years from July 30, 1911, be and the same is hereby denied, and.

It is further ordered, adjudged, and decreed: That said lease is valid and subsisting, and was duly and legally extended for the said period.

It is further ordered, adjudged, and decreed: That the water concessions of 1861 and 1868 for the use of certain water from the rivers Lapa and Majada on certain lands, of which the estate of Teresa forms a portion, are valid and legal concessions, and that the same are in full force and effect.

It is further ordered, adjudged, and decreed: That the action of the defendant Manual González in restoring Lapa canal and the flow of the waters of the river Lapa through the same should and does inure to the benefit of the estates Teresa, Aguirre, Carmen, Amadeo, and that the right to the use and enjoyment of the said Lapa waters shall revert to the owners or possessors of said estates at the expiration of the terms of the said agreement, under which the said González restored the said Lapa canal, but that in any event as to the estate Teresa that the same shall so revert to the said lands at the expiration of the term of the lease therefor, as hereby decreed; and the court does further decree that in the meantime the said waters from the said Lapa concession are being legally used by the said González, but that such use thereof is in trust for the owner of the said estates so interested therein.

It is further ordered, adjudged, and decreed by the court: That the complainants are authorized and entitled to have and receive from the district court of the judicial district of Ponce, Porto Rico, all sums of money which have been consigned by the defendants or any of them in the registry of said court, for the payment of rentals for the said estate Teresa from the year 1911.

Semidey v. Central Aguirre.

It is further ordered, adjudged, and decreed: That the defendants shall refund and repay to complainants the amount of costs taxed against and paid by complainants in case No. 226 in equity in this court, and that in case of the failure to repay the same that the said complainants may have execution therefor.

It is further ordered, adjudged, and decreed: That the court costs in this present suit be divided, and that the same be paid equally by the complainants and defendants herein.